# Case No. 9,289.

MATTHEWS et al. v. MENEDGER et al.

[2 McLean, 145.] [1]

Circuit Court, D. Ohio. July Term, 1840.

JUDGMENT—ON TRESPASS—BAR—ELECTION—PRINCIPAL AND AGENT—INDEMNIFICATION—SPECIAL LIEN—POSSESSION—INTEREST AS DAMAGES.

1. A judgment·against one of several joint trespassers, is no bar to an action against another individual for the same trespass.

2. Having several judgments for the same trespass, the plaintiff may make his election on which one he will take out execution.

3. In such a case there can be but one satisfaction. The same rule applies in the action of trover. for successive conversions, by different individuals, of the same property.

4. The record of a judgment for the same cause can only be received in evidence to bar the plaintiffs' action. or to show that certain proceedings, under it, have operated to change the right of property.

5. Where a person becomes an agent to purchase wheat, or any other article, and a part of the money raised to pay for the wheat was obtained on his credit, he may withhold the delivery of the wheat. until he is indemnified. And this is especially the rule where the principal is insolvent, and the liability of the agent to pay·is about to be enforced.

6. A factor has a lien for all advances, on account of his principal, for balances due, or for liabilities incurred in the course of their business. But this lien is special, and is connected with the possession of the property.

[Cited in Jordan v. James, 5 Ohio, 100; McGraft v. Rugee, 60 Wis. 409, 19 N. W. 531.]

7. If the property be voluntarily delivered, the lien is extinguished, and can not be reasserted. But if the delivery be special, so that the factor still retains the control of the property, the lien is not relinquished.

8. A jury, in the exercise of their discretion, may give interest on the value of property converted, as a part of the damages.

[This was a suit for damages by Matthews and Hopkins against P. & E. L. Menedger.]

Ewing & Stansbery, for plaintiffs.
Vinton & Wright, for defendants.

OPINION OF THE COURT. This is an action of trover, for a flatboat, and five thousand bushels of wheat, in barrels and sacks. It was proved that the plaintiffs were merchants in Baltimore, and in September, 1836, they made a contract with McCourtney and Read, merchants of Wheeling, to purchase for them a large quantity of wheat, which they were to have shipped to the plaintiffs by the way of New Orleans. Flatboats were to be used in conveying the wheat to New Orleans. At the time of the contract the plaintiffs advanced to McCourtney and Read ten thousand dollars, in two drafts of five thousand dollars each, which were paid at maturity. McCourtney and Read despatched an agent, by the name of Matthews, to Parkersburg, who made a contract with Chevalier, a resident of that place, to purchase the wheat at five per cent. upon the cost; McCourtney and Read to furnish the money. The sum of one thousand dollars was paid in a check by Matthews, and this Chevalier stated was sufficient, as it would enable him to make a small advance to the farmers on the purchase of the wheat. Chevalier having purchased about four thousand bushels of wheat, called on McCourtney and Read for money to complete the payments on this purchase, who drew a bill of exchange on E. Dorsey, for three thousand dollars, payable to the order of Cowgill & Son, at some bank in Baltimore. This bill was accepted by Dorsey, and made payable to Chevalier, by the indorsement of Cowgill & Son. It was negotiated by one of the banks

at Wheeling or Pittsburg, and the proceeds were paid to Chevalier, he being the last indorser. A flatboat was sent down to Spencer's farm, near Parkersburg, by McCourtney and Read, in charge of Ford, to receive the wheat. Shortly after this McCourtney and Read failed, and made an assignment of their effects. Before this was done they applied to Forsythe and Atturbury, of Wheeling, to become the agents of the plaintiffs, and represented that, they having advanced money to buy wheat, it was just that the wheat purchased should inure to their benefit. The proposed agency was accepted by Forsythe and Atturbury, and they despatched Matthews, as their agent, to Chevalier to inform him of the failure of McCourtney and Read, and that the wheat belonged to the plaintiffs; and he was, also, authorized to inform Chevalier that the bill for three thousand dollars, indorsed by him, would not be paid. Matthews communicated this intelligence to Chevalier before the loading of the boat was completed, there having been placed on board of it between fifteen hundred and two thousand bushels. This was the first intimation received by Chevalier that the plaintiffs had any interest in the wheat. He acted as the agent of McCourtney and Read, and supposed he made the purchase on their account. There was no more wheat delivered on board the boat after the arrival of Matthews; and Chevalier directed Ford to take the boat to Gallipolis, where he would meet him. The boat was taken to Gallipolis, and, on the arrival of Chevalier, he sold the wheat to the defendants, with the barrels in which a part of it was contained; the sacks they returned to the boat. The defendants paid to Chevalier eighteen hundred dollars for the wheat; and, owning a merchant mill, they manufactured it, and sent the flour to New Orleans, where it was sold at a good profit. Before the sale of the wheat to the defendants they admitted that Chevalier informed them of the circumstances, but what those circumstances, thus communicated, were, does not appear from the evidence.

The defendants offered in evidence the record of a judgment, in 1839, against Chevalier, in favor of McCourtney and Read, in the state of Virginia, in an action of trover for the same wheat. And, on the record, there was an indorsement that the suit was brought for the benefit of Matthews and Hopkins. To the introduction of this record the plaintiffs objected, as it was not between the same parties, and could for no legal purpose be received in evidence. But the defendant's counsel insisted that it was evidence, if not as a bar to the plaintiffs' action, to show where the legal right to the wheat was vested, to influence the jury in their assessment of damages in the present action; and, also, to show that, by the judgment in Virginia, the right of property, in the wheat, became vested in Chevalier. The form of the action in Virginia was the act of the attorney, and if he, by mistake,

brought the action in the names of McCourtney and Read instead of the plaintiffs, that should not operate to their prejudice. So far as that action was concerned, the plaintiffs were bound by the acts of their attorney, as matters of form as well as to matters of substance, but beyond these they were not bound. The indorsement on the record, that the suit was brought for the use of the plaintiffs, is a fact, which it is not perceived can be received as evidence in this case. The indorsement was the act of the attorney, and cannot affect the rights of the plaintiffs in any other suit. Nor can the court perceive how the damages, recovered in the Virginia judgment, can influence the jury in the present case. The parties are different, and the evidence is different. How then can the jury be guided, or in the least degree influenced, by the verdict in Virginia? If the Virginia judgment can be received in evidence, it must be received in bar of the plaintiffs' action, or to show a change of property.

The defendants' counsel do not insist that, under the circumstances, the Virginia judgment is a bar to the present action. To constitute a bar the judgment must not only have been for the same subject matter, but between the same parties. Did the Virginia judgment operate to vest the right of property in Chevalier, the defendant? That this effect must be given to the judgment, is strongly insisted on by the defendant's counsel. And if this position be sustained there is an end to the present action. For, if the right of property to the wheat was in Chevalier, his sale to the defendants can not be shaken. How can the obtainment of the judgment operate a change in the right of property? Before the rendition of the judgment the plaintiffs had the right of property, and a demand against Chevalier for converting it to his own use; and after the judgment this demand remains, though it has assumed a different form.

A judgment against one of several joint trespassers is no bar to an action against either of the others. There is some conflict of decision on this point, but the weight of authority, and the current of modern decisions, sustain the above principle. All joint trespassers are liable severally as well as jointly, and the rule is well established, that there may be several judgments against different individuals for the same trespass, but only one satisfaction. Wright v. Lathrop, 2 Ohio, 33; 8 Cow. 43; 1 Johns. 290. After several judgments are obtained for the same trespass, the plaintiff may make his election, on which judgment he will take out execution; and, having done this, he can not proceed on the other judgments. From this it appears that one joint trespasser can not plead in bar a prior judgment against another for the same trespass; but to be a good bar the plea must state that the prior judgment has been satisfied, or, at least, that the plaintiff has elected to take the judgment by issuing execution on it. Where the judg-

ment has been satisfied, which extinguishes the demand of the plaintiff, for the value of the property, the right of the property must, consequently, vest in the defendant. He has paid its value to the plaintiff, and, in addition, perhaps, something for the manner in which the property was taken. But before this satisfaction the defendant can set up no color of right to the property, on the ground that a judgment has been obtained against him for its value. The same rule that applies in a case of joint trespassers, in regard to the plea of a prior judgment in bar, and the change of property, must apply with equal, if not greater, propriety, in successive actions of trover, brought against different individuals, for the conversion of the same property.

In the case under consideration the judgment against Chevalier did not vest the property in him, and, consequently, he had no right, on this ground, to sell it to the defendants. And if the defendants, on demand, refused to deliver the property to the plaintiffs, they were guilty of a conversion, and are liable in this action. From these considerations the court think the record of the Virginia judgment is not evidence to bar the plaintiffs' action; to influence the jury in their assessment of the damages in this case; to show in whom the legal right to the property is vested; or, for any other conceivable legal purpose. Before the jury the counsel contended that the right of property was clearly shown, by the evidence, to be in the plaintiffs. That McCourtney and Read acted as their agents, and received from them ten thousand dollars. That the indorsement of the draft, by Chevalier, for the three thousand dollars, gave him no lien on the wheat purchased. That it was an ordinary case of indorsement, which gave the indorser no specific lien on the property of the drawer, when it might happen to come into his hands. But that, if a lien could arise out of this transaction, the delivery of the wheat, by Chevalier, on board of the plaintiffs' boat, and to Ford, their agent, who had charge of the boat, it was relinquished, and can not afterwards be asserted. That this delivery placed the wheat as much out of the power and control of Chevalier, as if it had been delivered into the warehouse of the plaintiffs. That the lien of a factor or agent is inseparable from the actual or implied possession of the property. That a tortious possession does not divert the lien, but that every voluntary relinquishment of the possession of the property is an abandonment of the lien. That the greater part of the wheat purchased was not delivered, and that to such part, if a lien existed, the plaintiffs could set up no claim, as against Chevalier, without indemnifying him. That it was not shown that Chevalier had paid more than one half of the three thousand dollar bill, though he had the bill in his possession; and having retained more than half of the wheat

purchased, and the sum of eighteen hundred dollars received from the defendants, he was bound, in justice, to account to the defendants for any loss or damages they should sustain by the purchase of the wheat. That if the plaintiffs should recover in this action, they would still be losers, by the failure of McCourtney and Read, about eight thousand dollars, and that Chevalier could have no ground of complaint, if he, by giving credit as an indorser to the same firm of McCourtney and Read, should, also, sustain a loss which, at most, would be very small in comparison with the plaintiffs'.

These positions were all controverted by the counsel for the defendants, and they insisted there was no such delivery of the wheat, in question, as divested the lien of Chevalier. The court instructed the jury, substantially, as follows:

After recapitulating the evidence, as above stated, you must be satisfied, gentlemen, that the legal right of property in this wheat was in the plaintiffs, before you can find in their favor. And this the plaintiffs insist has been shown by the contract with McCourtney and Read, the advance to them of ten thousand dollars, and the fact of the purchase of the wheat, by Chevalier, under their direction. So far as it regards this right, it can be of no importance, whether Chevalier had any knowledge of it or not. He, no doubt, until after the failure of McCourtney and Read, considered himself as their agent in purchasing the wheat. And he looked to them, only, for the necessary funds. But this could not, in any respect, affect the agency for the plaintiffs, under which McCourtney and Read acted. It is by no means necessary, in establishing their right, for the plaintiffs to show that the same money advanced to McCourtney and Read was handed over to Chevalier. Having made the advance, McCourtney and Read were bound, in good faith, to purchase the wheat and pay for it; and so far as such purchase was made by themselves or their agent, as against them, the legal right to the wheat, was, unquestionably, in the plaintiffs. If the indorsement, by Chevalier, of the three thousand dollar draft, was one of ordinary occurrence, as contended by the plaintiffs' counsel, it is clear that it gave him no specific lien on the property of the drawer. But is this the character of that transaction? Chevalier had engaged to purchase wheat for McCourtney and Read, and had, in fact, purchased four thousand bushels, at one dollar per bushel, having received from them an advance of one thousand dollars; he calls upon them for funds to complete his payments, and the sum of three thousand dollars is raised, partly on his credit. And about the time he was to deliver the wheat, he is informed that McCourtney and Read had failed, and that the bill which he had indorsed would not be paid. Under these circumstances had not Chevalier a right to withhold the delivery of the wheat until he

was indemnified? The court think he had, whether such delivery was demanded by McCourtney and Read or the plaintiffs. In making the purchase Chevalier acted as the agent of McCourtney and Read; and the rule of law which applies to a factor will apply equally to him. A factor has a lien on the property of the principal, in his hands, for all advances made, and for any balance that may be due. The lien, also, exists for responsibilities incurred by the factor for the principal, in the general course of their business. And this is, especially, the case where the principal is insolvent, and the liability of the factor is about to be enforced. 3 Har. & J. 339; 6 Greenl. 51-57; 10 Wend. 318; 2 Kent, Comm. 638, 639.

No case could well be imagined which could more strongly illustrate the propriety and justice of the rule, which gives a lien for responsibilities incurred, than the one under consideration. But this lien is put an end to by a voluntary delivery of the property. And this case must turn on the fact of the delivery of the wheat, by Chevalier, in the boat, to Ford, the agent of McCourtney and Read, or of the plaintiffs, it matters not which. The boat was purchased by McCourtney and Read for the plaintiffs, in pursuance of their contract, and the management of the boat was committed to Ford. It seems from fifteen hundred to two thousand bushels of wheat were delivered on board of this boat by Chevalier. This was done before he was informed of the insolvency of McCourtney and Read; that the wheat belonged to the plaintiffs; and that the bill he had indorsed would not be paid. Now, if there was an unconditional delivery of this wheat to the agent of the plaintiffs, or of McCourtney and Read, the lien was abandoned. The factor or agent can not stop property in transitu, where he has voluntarily delivered up the possession of it, on any pretence that he has a lien upon it for advances made on account of the principal. Having parted with the possession of the property he has relinquished his lien and can not reassert it. The owner may, in some cases, regain the possession of property, sold and delivered by him, and hold it until the payment of the consideration shall be received. But this can not be done by a factor whose interest is special, and connected with the possession. If you shall find that the delivery of the wheat was conditional, and, in fact, made to Ford as the agent of Chevalier, and to be subject to his control, then there was not such a delivery as divested Chevalier's lien, and the plaintiffs must fail in their action. If the wheat had been lost between the place where it was put on board of the boat and Gallipolis, whose loss would it have been? This may illustrate the character of the delivery. For if there was such a delivery as to make the loss that of the plaintiffs, then there is no ground on which the lien of Chevalier can be enforced.

With the possession he parted with the lien. But, on the contrary, if the loss had one occurred, could have been charged to Chevalier, then he did not part with the possession, or the lien connected with it.

The jury will determine from the evidence as to the effect of the delivery of this wheat, under the above rule. It is immaterial, if you shall find for the plaintiffs, whether the defendants had notice or not of the foregoing circumstances, prior to their purchase of the wheat. For if the lien of Chevalier was extinguished by a delivery of the property, he could convey no right to it which can defeat the plaintiffs' title. A demand of the property, by the plaintiffs, under such circumstances, and a refusal by the defendants, is all that is necessary to sustain the action. Should you find for the plaintiffs, you have a right, in the exercise of your discretion, to include interest on the value of the property sold to the defendants from the time of its conversion, as a part of the damages.

The jury could not agree on their verdict, and they were discharged by the court, and the cause was continued.

At the subsequent term the case was submitted to the jury on, substantially, the same charge, when the jury found for the plaintiffs.